UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SUSAN BEAUVAIS,

Plaintiff,

v.

CITY OF INKSTER and BOOKER
SNOW,

Defendants.

_____/

Case No. 16-cv-12814

UNITED STATES DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

UNITED STATES MAGISTRATE JUDGE
STEPHANIE DAWKINS DAVIS

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT CITY OF INKSTER'S MOTION FOR SUMMARY JUDGMENT [31]

## I.    Introduction

On August 1, 2016, Plaintiff Susan Beauvais ("Plaintiff" or "Beauvais") filed a Complaint against the City of Inkster, Michigan ("Defendant" or "Inkster") and former Inkster Police Officer Booker Snow.  *See* Dkt. No. 1.  Plaintiff amended her Complaint on February 3, 2017.  *See* Dkt. No. 18.  There, she alleges violations of the following state and federal laws:  violations of the Americans with Disabilities Act ("ADA") (Count I); violations of the Family and Medical Leave Act ("FMLA") (Count II); violations of Michigan's Elliot-Larsen Civil Rights Act ("ELCRA") and Title VII of the Civil Rights Act of 1964 based on sexual harassment, (Count III); and violations of Title VII of the Civil Rights Act of 1964 based on retaliation (Count IV).  *See id.*

1

Presently before the Court is Defendant Inkster's Motion for Summary Judgment [31]. For the reasons discussed herein, the Court will GRANT IN PART and DENY IN PART Defendant's Motion for Summary Judgment [31]. The Court GRANTS the Defendant's Motion as to Counts I, II and III, and DENIES Defendant's Motion as to Count IV.

## II. Background

Plaintiff Susan Beauvais worked as a police officer for the City of Inkster, Michigan during various periods from November 2007 until May 2017. Dkt. No. 18, p. 2 (Pg. ID 130); Dkt. 32, p. 22 (Pg. ID 1223).

### A. Sexual Harassment Allegations

Plaintiff alleges that her former co-worker, Defendant Booker Snow, sexually harassed her on several occasions. Dkt. No. 32, p. 14–15 (Pg. ID 1215–16). On April 12, 2014 Officer Snow approached her and whispered in her ear "[y]ou're feeling frisky aren't you?" Dkt. No. 32-25, p. 2 (Pg. ID 1396). He continued "I can take care of that, yes I can." *Id.* Four days later, on April 16, 2014, Snow approached her as she "was sitting with [her] hands behind [her] head," and began "taking pictures of her chest" with his cell phone. *Id.*; *see also* Dkt. No. 32-24, p. 2 (Pg. ID 1394). Uncomfortable with Snow's actions, Beauvais crossed her arms to block her chest. Dkt. No. 18, p. 12 (Pg. ID 140). Snow, however, told Beauvais to lift up her arms. *Id.*

2

On another occasion, Snow showed Beauvais a picture of his girlfriend and said "[m]y girl loves black cock and white pussy, you know we really both could take care of you. Yeah, we could make you feel good and totally relax." *Id.* Beauvais also frequently overheard Snow refer to women with whom he lived as "ho's" and heard him telling these women "to get naked before he got home because he wanted to 'be sucked." *Id.*

B.     Report to Supervisors and Inkster's Response

Beauvais orally notified her supervisors of Snow's actions on April 16, 2014, and on April 24, 2014, she gave them a written complaint detailing Snow's actions.[1] Dkt. No. 32-45, p. 2 (Pg. ID 1456); Dkt. No. 18, p. 2–3 (Pg. ID 130–31).

Immediately after Beauvais reported Snow's actions, Inkster pledged to separate Beauvais and Snow.  Dkt. No. 32, p. 16–17 (Pg. IDs 1217–18).  The day following Beauvais's complaint, however, Snow remained on the same shift as Beauvais.  *Id.*  This shift was the last one Beauvais and Snow would work together. *See* Dkt. No. 32-2, p. 12 (Pg. ID 1249); *see also* Dkt. No. 31, p. 16 (Pg. ID 234).

Inkster held an internal disciplinary hearing regarding Beauvais's complaints. Dkt. No. 31, p. 36–37 (Pg. ID 254–55); Dkt. No. 32-47, p. 2 (Pg. ID 1476).  The then

---

[1] Nine months later, in January 2015, Beauvais filed a written complaint with the United States Equal Employment Opportunity Commission ("EEOC") asserting that the Inkster Police Department harbored a hostile work environment and that she had been retaliated against because of her complaints regarding sexual harassment.  Dkt. No. 32, p. 18 (Pg. ID 1219); Dkt. No. 32-30, p. 2 (Pg. ID 1418).

Chief of the Inkster Police Department, Vicki Yost, conducted the hearing and concluded that Snow violated Inkster's sexual harassment policies. Dkt. No. 32-47, p. 2 (Pg. ID 1476). Because of this finding, Yost imposed on Snow a three-day suspension: he was to pay back one day in salary, serve one day immediately, and then serve another day if accused or found culpable of similar conduct. Dkt. No. 31-5, p. 2 (Pg. ID 371).

Additionally, Inkster hired an independent law firm to investigate Beauvais's allegations regarding Snow and whether gender or sexual harassment issues permeated the Inkster Police Department. Dkt. No. 31-4, p. 2 (Pg. ID 348). The law firm interviewed Beauvais, Snow and other officers relevant to Beauvais's allegations, and also reviewed videotape of interactions between Beauvais and Snow. *Id.* It concluded that Snow's comments to Beauvais "were inappropriate, and could be considered sexual harassment, warranting disciplinary action." *Id.* at p. 3 (Pg. ID 349).

Human Resources Director LaZonja Smith ordered sexual harassment training for the Police Department and also other Inkster City Departments. Dkt. No. 32, p. 28–29 (Pg. ID 1229–30). Smith testified that the training was motivated by two considerations: (1) the City, including the police department, had not had sexual harassment training in several years; and (2) complaints of sexual harassment, including Plaintiff's complaint. Dkt. No. 31-7, p. 37 (Pg. ID 424).

C.     Request for Personal Leave

On September 10, 2014, writing to Chief Yost, Beauvais requested "an extended personal leave from work to handle some personal issues." Dkt. No. 32-9, p. 2 (Pg. ID 1319). Beauvais requested leave from September 24, 2014 through November 9, 2014. *Id.* She wrote that she would be willing to take this leave as unpaid and that her "request is solely based for the purpose to handle pertinent personal issues/matters." *Id.*

Beauvais supported her request for leave with letters from two of her doctors, Dr. Robert Klotz and Dr. George Nicoloff. Dkt. No. 31-13. Dr. Klotz's letter is dated September 8, 2014, and addressed to Chief Yost. *Id.* at p. 2 (Pg. ID 587). Klotz wrote that he examined Beauvais "for signs and symptoms of acute work related stress," and that "[a]s a result of this stress, she is suffering from a number of physical and emotional signs and symptoms that are typical reactions consistent with issues of personal safety, work-related problems." *Id.* Klotz explained that her "issues are not related to being a patrol officer on the streets"; rather, "[s]he is stressed about Departmental issues affecting duty performance." *Id.* Likewise, Dr. Nicoloff also addressed his letter to Chief Yost and explained that Beauvais was "suffering from work related stress with symptoms of anxiety, panic attacks, and other stress related symptoms." *Id.* at p. 3 (Pg. ID 588).

Chief Yost granted Beauvais's request for leave. *See* Dkt. No. 31-14, p. 33 (Pg. ID 621). Inkster classified Beauvais's temporary departure as worker's compensation leave because Beauvais "cited it as job-related." *Id.*

D.    Medical Examinations

On December 29 and December 30 of 2014, Beauvais's doctors cleared her to return to work without restrictions. *See* Dkt. No. 31-17, p. 2–3 (Pg. ID 749–50). Dr. Klotz observed that "[Beauvais's] signs and symptoms of Acute Work-Related Stress have evolved, and are no longer present." *Id.* at 2 (Pg. ID 749). Similarly, Dr. Nicoloff determined that "[Beauvais] has recovered fully and is medically cleared to return to work full time." *Id.* at 3 (Pg. ID 750).

Beauvais did not immediately return to work, however, as Chief Yost required that Beauvais undergo an independent medical evaluation in advance of her return. Dkt. No. 31-14, p. 35, 42–43 (Pg. ID 623, 631–32). Yost testified that she required Plaintiff to undergo an independent medical exam based on a concern "as to whether [Beauvais] was capable of performing her duties." *Id.* at p. 35 (Pg. ID 623). Specifically, Yost testified that she was concerned for two reasons: Beauvais's September 2014 doctors' notes and "Inkster's liability." *Id.*

Beauvais underwent an independent medical evaluation and, on April 21, 2015, obtained independent medical clearance to return to work without restrictions. Dkt. No. 31-18, p. 15–16 (Pg. ID 765–66). Yet she did not return to work until May

6

12, 2015. Dkt. No. 32, p. 9, 31 (Pg. ID 1210, 1232). Human Resources Director Smith testified that she did not know why Beauvais did not return to work before May 12, 2015. Dkt. No. 32-12, p. 13 (Pg. ID 1342). Smith said that although the doctor's letter clearing Beauvais is dated April 21, 2015, she does not recall when Inkster received the letter. *Id.* Smith said that Inkster may not have returned Beauvais to work earlier because Inkster was busy defending a lawsuit, may have encountered scheduling issues, or may have had difficulty contacting Beauvais. *Id.*

E. FMLA Leave

Plaintiff requested FMLA leave on December 10, 2015. Dkt. No. 31-35, p. 2 (Pg. ID 1181). Human Resources Director Smith initially denied Beauvais's request because Smith did not believe that Beauvais had worked the requisite number of hours for leave under the FMLA. Dkt. No. 32-37, p. 2 (Pg. ID 1435). On December 11, 2015, Beauvais gave Smith evidence that she had worked the necessary number of hours. *Id.* Beauvais received approval of her FMLA leave on December 16, 2015. Dkt. No. 31-35, p. 2 (Pg. ID 1181).

F. Employment Actions

On July 4, 2016, Beauvais was promoted to acting Sergeant. Dkt. No. 31, p. 22 (Pg. ID 240). Because of this promotion, she received an increase in pay. Dkt. No. 31-21, p. 72 (Pg. ID 849). This was only a temporary position, however. Dkt. No. 31-6, p. 14 (Pg. ID 386). Moreover, Beauvais's promotion was partly motivated

by an injury to the then Sergeant, Linda Davidson. *Id.* Davidson was placed on leave, and therefore, could not fulfill her duties. *Id.*

Beauvais was demoted back to police officer in December 2016 or January 2017, and she learned of this demotion in a wide-spread email distribution. Dkt. No. 32, p. 19–20 (Pg. ID 1220–21). At the time of Beauvais's demotion, Sergeant Davidson had not returned to full duty, but was back to work completing administrative tasks. Dkt. No. 31-6, p. 14 (Pg. ID 386).

Inkster asserts that it demoted Beauvais because of budgetary constraints. Dkt. No. 31, p. 22 (Pg. ID 240). Inkster had exceeded its budget for overtime expenses, however, and had paid certain officers overtime for tutoring individuals in the police academy. *See* Dkt. No. 32-7, p. 6 (Pg. ID 1311); *see also* Dkt. No. 32-28, p. 5 (Pg. ID 1414).

## III.    Legal Standard

Federal Rule of Civil Procedure 56(c) "directs that summary judgment shall be granted if 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 779 (6th Cir. 1998). The court must view the facts, and draw reasonable inferences from those facts, in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). No genuine dispute of material fact exists where the record "taken as a whole could not

lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## IV. Discussion

Defendant City of Inkster asserts it is entitled to summary judgment on all of Plaintiff's claims. *See* Dkt. No. 31, p. 1–2 (Pg. ID 219–20). Inkster argues that the Plaintiff does not raise a genuine dispute of material fact regarding whether Defendant Inkster (1) "regarded" Plaintiff as disabled under the ADA (Count I); (2) engaged in conduct that satisfies a *prima facie* case of FMLA interference (Count II); (3) committed acts proving a *prima facie* case of sexual discrimination under Title VII or the ELCRA (Count III); and (4) retaliated against Plaintiff in violation of Title VII (Count IV). For Counts I, II and III, the Court finds that the Plaintiff fails to raise a genuine dispute regarding a material fact, and therefore, the Court will grant summary judgment as to those Counts. For Count IV, however, the Court finds that there is a genuine dispute of material fact that prevents summary judgment as to that Count.

A.    ADA Claims

The Court will first consider Beauvais's claim that the City of Inkster regarded her as disabled because the City required her to undergo a fitness-for-duty evaluation and delayed her return to work. The Court finds that Beauvais's claim fails as a matter of law.

The ADA forbids "discrimination by a covered entity 'against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.'" *Spees v. James Marine, Inc.*, 617 F.3d 380, 395 (6th Cir. 2010) (quoting 42 U.S.C. § 12112(a)). Where plaintiffs allege discrimination based on circumstantial evidence, courts apply the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, "[t]o make out a *prima facie* case of discrimination under the ADA, a plaintiff must show '(1) that she or he is an individual with a disability, (2) who was otherwise qualified to perform a job's requirements, with or without reasonable accommodation; and (3) who was discriminated against solely because of the disability.'" *Spees*, 617 F.3d at 395 (quoting *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008)). "The third element requires that the plaintiff suffer an adverse employment action." *Id.* (citing *Talley*, 542 F.3d at 1105).

If Beauvais makes this *prima facie* case, the *McDonnell Douglas* framework next requires that Inkster provide a legitimate, non-discriminatory reason for its conduct. *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 813 (6th Cir. 1999). Finally, "[i]f defendant does so, the burden shifts back to [Beauvais] to show that the proffered reason is pretext for unlawful discrimination." *Johnson v. Univ. Hosps. Physician Servs.*, 617 F. App'x 487, 491 (6th Cir. 2015) (citing *Sullivan*, 197 F.3d at 813).

Plaintiff argues that she was an individual with a "disability" under the ADA because Inkster regarded her as disabled. Dkt. No. 32, p. 23 (Pg. ID 1224). Under the ADA, a 'disability' is "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1). Beauvais's assertion requires her to raise a genuine dispute about whether Inkster regarded her as having "an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity," and that the impairment was in fact or perceived to last longer than six months. *Id.* at § 12102(3)(B).

She first alleges that reasonable minds may disagree about whether Inkster regarded her as disabled because the City requested that she undergo an independent fitness-for-duty examination. Dkt. No. 32, p. 23, (Pg. 1224). The Court disagrees.

"An employer's request that an employee undergo a medical exam 'may signal that an employee's job performance is suffering, but that cannot itself prove a perception of a disability because it [alone] does not prove that the employer perceives the employee to have an impairment that substantially limits one or more of the employee's major life activities.'" *Johnson*, 617 F. App'x at 491 (quoting *Sullivan*, 197 F.3d at 810). A request for a fitness examination cannot prove disability because "'[d]eteriorating [employee] performance may be linked to motivation or other reasons unrelated to disability.'" *Id.* (quoting *Sullivan*, 197 F.3d at 811).

The City of Inkster contends it demanded that Beauvais undergo an independent fitness-for-duty examination because Beauvais requested leave based on work-related issues, as detailed in the doctors' notes that Beauvais offered to support her leave request. Dkt. 31-14, p. 29–31 (Pg. ID 617–19). In these notes, Beauvais's personal doctors observed that she was having "issues of personal safety, work-related problems," and that although "[h]er issues are not related to being a patrol officer on the streets," "[s]he is stressed about Departmental issues affecting duty performance." *Id.*; Dkt. 31-13, p. 2 (Pg. ID 587). The doctors concluded that Beauvais was suffering from "symptoms of anxiety, panic attacks, and other stress related symptoms." Dkt. 31-13, p. 3 (Pg. ID 588).

These issues specifically relate to Beauvais's capacity to do her job. For example, in *Johnson*, an examination referral was directly related to a plaintiff's job where the referral included language that the plaintiff "was falling asleep at work, and generally had a difficult relationship with her manager." 617 F. App'x at 491 (internal citations omitted). Similarly, Beauvais's difficult interactions with co-workers on the job caused her stress, and this stress culminated in her request for leave.

Unlike in *Johnson*, Inkster has not shown that Beauvais's work performance was deteriorating. Beauvais's symptoms of "anxiety" and "panic attacks" because of relationships with co-workers, however, provided Inkster with a sufficient basis for inquiring about whether she could capably perform her job. Indeed, Chief Yost testified that she required Beauvais to undergo an independent medical evaluation because of a concern "as to whether [Beauvais] was capable of performing her duties." Dkt. No. 31-14, p. 35 (Pg. ID 623). This concern stemmed from the doctors' notes and a concern about Inkster's liability. *Id.* There is no evidence that Chief Yost or anyone in the Inkster Police Department viewed Beauvais's medical issues as extending beyond her ability to discharge her duties as a police officer. Therefore, reasonable minds would all agree that Inkster required Beauvais to undergo a fitness-for-duty examination because of a concern about her ability to do her job, not any perception of disability.

Beauvais also argues the Defendant regarded her as disabled because it improperly delayed her return to work.  Specifically, Beauvais argues that Inkster prevented her from scheduling an independent medical examination—a condition of her return to work—and that its initial justification for this action was pretext.  Dkt. No. 32, p. 13 (Pg. ID 1214).  Beauvais alleges Inkster's initial justification was that she first had to withdraw a pending worker's compensation claim.  *Id.*  Even assuming this was Inkster's initial justification, however, this allegation does not raise a genuine dispute about whether Inkster regarded Beauvais as disabled.  The record reflects that the City categorized Beauvais's absence as worker's compensation leave based on Beauvais's description of her absence as "job-related." Dkt. No. 31-14, p. 32–33 (Pg. ID 620–21).  Consequently, there is no evidence that Inkster regarded her as disabled through this alleged initial justification.

Further, Beauvais asserts that she raises a genuine dispute of material fact about whether Inkster regarded her as having a disability because Inkster knew that she was having medical problems and, in contravention of the ADA, still requested that she undergo an independent medical evaluation.  The Sixth Circuit has already rejected this argument.  *See Pena v. City of Flushing*, 651 F. App'x 415 (6th Cir. 2016).

In *Pena*, the court held that Sixth Circuit precedent "recognize[s] the policy choice Congress made by permitting employers to request fitness for duty

examinations as long as they are 'job-related and consistent with business necessity.'" *Id.* at 420 (quoting 42 U.S.C. § 12112(d)(4)(A)). The court "decline[d] to impose per se liability under the 'regarded as' provision," reasoning that "[o]therwise, [it] would be reading § 12112(d)(4)(A) out of the ADA." *Id.* Likewise, in this case, Plaintiff's claim that Inkster regarded her as having a disability must fail as a matter of law because Inkster's request for an independent medical evaluation was "job-related and consistent with business necessity." *See* 42 U.S.C. § 12112(d)(4)(A).

Finally, Beauvais asserts that reasonable minds may disagree about whether Inkster regarded her as disabled because Inkster did not rely on the medical opinions of Beauvais's doctors, and instead requested that she see an independent doctor. This argument is unavailing. *See Pena*, 651 F. App'x at 422 (observing that "an employee 'may not dictate the terms of his medical examination.' In other words, that Pena's doctors cleared him for duty does not excuse him for failing to see Dr. Forsberg." (quoting *Sullivan*, 197 F.3d at 809 n.2)).

Accordingly, the Court will grant Inkster summary judgment on Plaintiff's ADA claim.

B.     FMLA Claims

It is undisputed that the (1) Plaintiff requested FMLA leave on December 10, 2015; (2) Defendant requested additional evidence regarding Beauvais's

employment hours and Beauvais provided this information on December 11, 2015; and (3) the Defendant granted Plaintiff leave on December 16, 2015. *See* Dkt. No. 31-35, p. 2 (Pg. ID 1181); Dkt. No. 32-37, p. 2 (Pg. ID 1435).

Plaintiff argues that Inkster violated the FMLA by improperly delaying its grant of Plaintiff's request for FMLA leave. *Id.* Inkster contends, and the Court agrees, that it complied with all regulatory and statutory requirements in granting Plaintiff FMLA leave. Dkt. No. 31, p. 3 (Pg. ID 221). Thus, reasonable minds would all agree that Plaintiff has not established an FMLA claim.

Under the FMLA, an employer must not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the FMLA]." 29 U.S.C. § 2615(a)(1). Prohibited interference includes "refusing to authorize FMLA leave" or "discouraging an employee from using such leave." 29 C.F.R. § 825.220(b). To establish a *prima facie* case of FMLA interference, a plaintiff must show: "(1) he was an eligible employee; (2) the defendant was a covered employer under the FMLA; (3) he was entitled to take leave under the FMLA; (4) he notified his employer of his intent to take leave; and (5) the employer denied him benefits or rights to which he was entitled under the FMLA." *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 427 (6th Cir. 2014).

"Interference occurs when an employer 'shortchange[s] [an employee's] leave time, den[ies] reinstatement, or otherwise interfere[s] with [an employee's]

substantive FMLA rights.'" *Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 384 (6th Cir. 2017) (quoting *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012)). Under the interference theory then, an employer's intent is irrelevant. *Id.* (quoting *Seeger*, 681 F.3d at 282).

Here, the parties do not dispute that the (1) Plaintiff was an eligible employee; (2) Inkster was a covered employer under the FMLA; (3) Plaintiff was entitled to take leave under the FMLA; and (4) Plaintiff notified Inkster of her intent to take leave.

On the fifth element, Plaintiff concedes the Defendant granted her FMLA leave. Thus, there is no genuine dispute about whether the Defendant violated the FMLA. Human Resources Director Smith initially denied Beauvais's request for leave; yet Smith's denial was based on a misunderstanding of how many hours Beauvais had worked. Dkt. No. 32-37, p. 2 (Pg. ID 1435). Beauvais was granted leave once she clarified this misunderstanding, and thereby confirmed that she was entitled to FMLA leave. *Id.* Inkster did not "shortchange" Beauvais's leave, deny her reinstatement, or otherwise interfere with her FMLA rights. Therefore, Beauvais's FMLA claim must fail as a matter of law.

C.      Sexual Harassment under Title VII

Plaintiff next argues reasonable minds may disagree about whether she was subject to a hostile work environment in contravention of Title VII and the ELCRA. The Court finds this argument unavailing.

"Primarily, '[c]ases brought pursuant to the ELCRA are analyzed under the same evidentiary framework used in Title VII cases.'"  *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 652–53 (6th Cir. 2012) (quoting *In re Rodriguez*, 487 F.3d 1001, 1007 (6th Cir. 2007)).  Courts apply the *McDonnell Douglas* framework, discussed above, to claims brought under Title VII or the ELCRA.  Specifically, the Sixth Circuit has held that:

> [u]nder Title VII, in order to make out a hostile-work-environment claim based on sexual harassment, an employee must show that: (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the charged sexual harassment created a hostile work environment; and (5) the employer is liable.

*Randolph v. Ohio Dep't. of Youth Servs.*, 453 F.3d 724, 732–33 (6th Cir. 2006) (citing *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999)).

Inkster does not contest that Beauvais was a member of a protected class; was subjected to unwanted sexual harassment; and complained of harassment based on sex.  Therefore, Plaintiff has established the first three elements of her hostile work environment claim.  Inkster does contest, however, whether a genuine dispute exists about the remaining two elements.

1.     Hostile Work Environment

Given the totality of the circumstances, the Court finds that the sexual harassment alleged by Beauvais was not sufficiently severe or pervasive to raise a genuine dispute of material fact regarding this element.

A hostile work environment exists where "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 309 (6th Cir. 2016) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "Both an objective and subjective test must be met; in other words, the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim." *Randolph*, 453 F.3d at 733 (citing *Harris*, 510 U.S. at 21–22).

In applying this objective and subjective test, courts evaluate the totality of the circumstances. *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011) (citing *Harris*, 510 U.S. at 23). In particular, courts examine "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Harris*, 510 U.S. at 23. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount

to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citation omitted). Psychological harm to the employee may also be a relevant consideration. *Harris*, 510 U.S. at 23.

Here, Beauvais does not allege that she was subject to physical harassment. *See Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333–34 (6th Cir. 2008) (citing *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 563 (6th Cir. 1999)) (observing "that harassment involving an 'element of physical invasion' is more severe than harassing comments alone"). Rather, Beauvais's allegations principally relate to comments and conduct by her co-worker at the time, Defendant Snow.[2] *See* Dkt. No. 18, p. 11–13 (Pg. ID 139–141); *see also* Dkt. No. 32, p. 14–15 (Pg. 1215–16). She complains of conduct by Defendant Snow directed at her, including:

> (1) Snow saying "you're feeling frisky aren't you?" and "I can take care of that, yes, I can.";
> (2) Several days after that incident, Snow "taking pictures of her chest," and when she objected and crossed her arms to block her chest, Snow telling her to raise her arms;
> (3) Snow telling Beauvais that "[his] girl loves black cock and white pussy, you know we really both could take care of you. Yeah, we could make you feel good and totally relax."

---

[2] Beauvais acknowledges that Officer Snow did not supervise her during the time period when he allegedly harassed her. Dkt. No. 32, p. 9 (Pg. ID 1210). Therefore, Plaintiff alleges sexual harassment by only a co-worker.

Dkt. No. 18, p. 11–13 (Pg. ID 139–141).  Snow made these comments over a span of several weeks.  *See Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 253 (6th Cir. 1998) (explaining harassment that is "commonplace, ongoing, and continual" is more likely to be pervasive or severe); *see* Dkt. No. 32-25, p. 2–4 (Pg. ID 1396–98).

Additionally, Beauvais alleges that Snow made inappropriate comments not directed at her, but in her presence, such as referring to women as "hos," discussing his "sexual activities with the two women with whom he lived," and "telling [the women with whom he lived] to get naked before he got home because he wanted to 'be sucked.'"  Dkt. No. 18, p. 12 (Pg. ID 140); *see Knox v. Neaton Auto Prods. Mfg., Inc.*, 375 F.3d 451, 459 (6th Cir. 2004) (finding that comments not directed at victim supported conclusion that harassment was not sufficiently severe to create hostile environment).

Therefore, although Snow's actions were distasteful and reprehensible, Beauvais fails to show reasonable minds may disagree about whether Snow's actions were sufficiently severe or pervasive to create an objectively hostile environment.

### 2.     Employer Liability

The Court concludes that Beauvais fails to raise a genuine dispute of material fact about whether Inkster should be liable for the alleged hostile work environment.

"Where an employee is the victim of sexual harassment, including harassment in the form of a hostile work environment, by non-supervisory co-workers, an

employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action." *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 274 (6th Cir. 2009) (quoting *Faragher*, 524 U.S. at 789). In other words, an employer may be held liable where its "response manifests indifference or unreasonableness in light of the facts the employer knew or should have known." *Hawkins*, 517 F.3d at 338 (quoting *Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868, 873 (6th Cir. 1997)) (observing that the holding in *Blankenship* that "mere negligence" is insufficient to warrant employer liability was abrogated, and now mere negligence is sufficient to establish employer liability and negligence).

Inkster was aware of Beauvais's allegations of harassment. Dkt. No. 32-25, p. 2–4 (Pg. IDs 1396–98). Plaintiff asserts there is a genuine dispute regarding whether Inkster took appropriate remedial action because, according to Beauvais:

> (1) Snow's disciplinary hearing was a farce, his punishment was *de minimis*, and in any event, any sanctioned punishment might not have been enforced;
> (2) Snow was not removed from Beauvais's shift the day after she submitted a formal complaint to Inkster;
> (3) The Inkster Police Department's sexual harassment training was not a response to her allegations (and was not effective). Rather, the training was given to various City agencies, as these agencies had not undergone sexual harassment training in some time.

*See* Dkt. No. 32, p. 16–17, 27–30 (Pg. IDs 1217–18, 1228–31). Inkster counters asserting that it hired an independent law firm to investigate Plaintiff's allegations

and the environment at the Inkster Police Department generally. Dkt. No. 31-4, p. 2

(Pg. ID 348). Defendant further argues that it conducted a prompt, fair internal

hearing regarding Plaintiff's allegations and removed Snow from Beauvais's shift in

a timely manner. Dkt. No. 31, p. 36–37 (Pg. ID 254–55).

In *Hawkins*, the Sixth Circuit explained that:

[c]ompanies that take affirmative steps reasonably calculated to prevent
and put an end to a pattern of harassment—such as personally
counseling harassers, sending them letters emphasizing the company's
policies and the seriousness of the allegations against them,
and threatening harassers with serious discipline if future allegations are
substantiated—are more likely to be deemed to have responded
appropriately.

517 F.3d at 342–43; *see also Fenton v. HiSAN, Inc.*, 174 F.3d 827, 831 (6th

Cir. 1999) (holding that employer responded adequately where, after the first

complaint regarding an employee, the employer separated the victim and

employee, threatened the employee with punishment if he failed to comply,

and warned him of continuing such behavior).

Inkster's response did not manifest indifference or unreasonableness as

a matter of law. Inkster conducted an internal disciplinary hearing and

punished Snow for violating departmental policies. Dkt. No. 32-47, p. 2 (Pg.

ID 1476). The City hired an independent law firm to investigate her

complaints and whether the police department had issues with gender or

sexual harassment. Dkt. No. 31-4, p. 2 (Pg. ID 348). Beauvais concedes that

although she shared a shift with Snow the day after her complaint, Inkster thereafter separated the two so that they never shared a shift again. Dkt. No. 31-1, p. 52 (Pg. ID 309). Inkster also conducted sexual harassment training. Dkt. No. 31-7, p. 37 (Pg. ID 424). Human Resources Director Smith testified that this training was in part motivated by Beauvais's allegations. *Id.* Inkster's responses are not negligent given that Snow's personnel file did not contain prior allegations of sexual harassment or gender discrimination. Dkt. No. 31-4, p. 2 (Pg. ID 348).

Therefore, as a matter of law Inkster took appropriate remedial measures in response to Beauvais's sexual harassment allegations.

D. Retaliation under Title VII

Beauvais asserts, and the Court agrees, that the Defendant is not entitled to summary judgment on her claim for retaliation in violation of Title VII.

As Plaintiff alleges a claim of Title VII retaliation based on circumstantial evidence, the aforementioned *McDonnell Douglas* framework also governs this claim. *See Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 674 (6th Cir. 2013), *abrogated on other grounds* by *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, ––– U.S. ––– –, 133 S. Ct. 2517, 186 L.Ed.2d 503 (2013). Under this framework,

> [t]he prima facie case consists of four elements: (1) the plaintiff engaged in activity protected under Title VII; (2) plaintiff's exercise of her protected rights was known to defendant; (3) an adverse employment action was subsequently taken against the employee or the

> employee was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

*Id.* (citing *Garner v. Cuyahoga Cnty. Juvenile Court*, 554 F.3d 624, 639 (6th Cir. 2009)). If a plaintiff succeeds with this showing, "the burden of production shifts to Defendant to 'articulate some legitimate, nondiscriminatory reason for [its action].'" *Spengler v. Worthington Cylinders*, 615 F.3d 481, 492 (6th Cir. 2010) (alteration in original) (quoting *McDonnell Douglas*, 411 U.S. at 802). Where a defendant presents a legitimate, nondiscriminatory reason for its conduct, "the burden shifts back to [p]laintiff to demonstrate that [d]efendant's 'proffered reason was not the true reason for the employment decision.'" *Id.* (quoting *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 320 (6th Cir. 2007)). "Throughout the entire *McDonnell Douglas* framework, the plaintiff bears the burden of persuasion." *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).

It is undisputed that Beauvais engaged in activity protected under Title VII and that the Defendant knew Beauvais had exercised her rights. Beauvais established the first element as she notified her supervisors of an apparent Title VII violation, which is "classic opposition activity," and filed a claim with the EEOC. *Wasek v. Arrow Energy Servs.*, 682 F.3d 463, 469 (6th Cir. 2012) (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000)). Beauvais has also satisfied

the second element. She reported her complaint to the Chief of the Inkster Police Department, and thus, Inkster knew that she had exercised her rights. *See id.* at 470. Therefore, Beauvais has raised a genuine dispute of material fact regarding elements one and two of this claim. The remaining elements, however, are in dispute.

### 1. Adverse Employment Action

Beauvais asserts a reasonable jury could conclude that she suffered an adverse employment action when (1) after she had received medical clearance from the City's independent doctor, Inkster delayed her return to work for three weeks; (2) she was demoted from acting Sergeant once Sergeant Linda Davidson returned to work, although not at full capacity; (3) Inkster removed her police powers during her fall 2014 leave; and (4) she was required to submit written questions following an incident, but an officer also on the scene was not. Plaintiff has persuaded the Court on allegations one through three, but not four.

To establish this element, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1217–18 (C.A.D.C. 2006)). Materially adverse actions include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a

material loss of benefits, [or] significantly diminished material responsibilities." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461–62 (6th Cir. 2000). They also include actions which "significantly impact an employee's wages or professional advancement." *Halfacre v. Home Depot, USA, Inc.*, 221 F. App'x 424, 433 (6th Cir. 2007).

As to the first allegation, Plaintiff had satisfied Inkster's requirement that she undergo an independent fitness-for-duty evaluation, yet she was not permitted to return to work until three weeks after being cleared. Dkt. No. 32, p. 31 (Pg. ID 1232). Because "excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination," not allowing an employee to work for three weeks must raise a genuine dispute about the satisfaction of this element here. *See Burlington*, 548 U.S. at 69.

Second, although Plaintiff was promoted to acting Sergeant in July 2016 (when Sergeant Linda Davidson took leave), Beauvais was demoted without explanation in December 2016 or January 2017. Dkt. No. 32, p. 19–20 (Pg. ID 1220–21). Indeed, she learned of her demotion in a wide-spread email distribution. *Id.* Even if this position was temporary, as Defendant contends, Sergeant Davidson had not yet resumed her full duties. Dkt. No. 32-4, p. 8 (Pg. ID 1271); Dkt. No. 32-7, p. 6 (Pg. ID 1311). There is a genuine dispute of material fact then regarding

whether this demotion, including the accompanying loss of title and wages, is a materially adverse action. Dkt. No. 32, p. 32 (Pg. ID 1233); *see* Dkt. No. 31-21, p. 72 (Pg. ID 849).

Third, reasonable jurors may differ as to whether Chief Yost's removal of Beauvais's police powers during her fall 2014 leave was a material adverse action. Specifically, on December 4, 2014, Chief Yost required Beauvais to relinquish her service weapon. Dkt. No. 18, p. 5 (Pg. ID 133). This requirement affected the material benefits of Beauvais's employment and could deter a reasonable person from raising sexual harassment allegations. Consequently, there is a genuine dispute whether this was a material adverse action.

Unlike the above-discussed allegations, Plaintiff's fourth example of retaliation—submission of written questions only to her, despite another officer's involvement in an incident—is not an adverse action as a matter of law. Plaintiff offers no evidence that this action impacted her wages, professional advancement, or otherwise meets this threshold. *See, e.g., Kocsis v. Multi–Care Mgmt. Inc.*, 97 F.3d 876, 886 (6th Cir. 1996) ("This court has held that reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims." (quoting *Yates v. Avco Corp.*, 819 F.2d 630, 638 (6th Cir. 1987))).

### 2.    Causation Regarding Retaliation

Beauvais has made the required *prima facie* showing for the first three elements of her retaliation claim. Her *prima facie* case then hinges on whether a reasonable juror could conclude that there is a causal connection between her report of sexual harassment and the three week delay in her return to work, her demotion from acting Sergeant, or her surrender of police powers. The Court finds that Beauvais makes this showing for all three allegations.

"To establish the causal connection that the fourth prong requires, the plaintiff must produce sufficient evidence from which one could draw an inference that the employer would not have taken the adverse action against the plaintiff had the plaintiff not engaged in activity that Title VII protects." *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 543 (6th Cir. 2003) (citations omitted). The Sixth Circuit has not adopted a uniform approach in examining whether the temporal proximity between protected activity and materially adverse actions establishes a causal connection. *See Krumheuer v. GAB Robins N. Am., Inc.*, 484 F. App'x 1, 5–6 (6th Cir. 2012). Yet the Sixth Circuit has held that "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 650 (6th

Cir. 2015) (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). Conversely, "where some time elapses' between the employee's protected activity and the adverse employment action, 'the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.* (citing *Mickey*, 516 F.3d at 525; *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009)).

Here, Plaintiff first complained to her supervisors of Snow's harassment on April 16, 2014, and submitted a written complaint on April 24, 2014. Dkt. No. 32-45, p. 2 (Pg. ID 1456); Dkt. No. 18, p. 2–3 (Pg. ID 130–31). In January 2015, Plaintiff filed a written complaint with the EEOC alleging that she was subject to a hostile work environment and had suffered retaliation in response to her complaints of sexual harassment. Dkt. No. 32, p. 18 (Pg. ID 1219); Dkt. No. 32-30, p. 2 (Pg. ID 1418).

Consequently, in the light most favorable to the Plaintiff, less than one year elapsed between Plaintiff's first protected activity and the first allegedly materially adverse action, the removal of her police powers in December 2014. This time period, standing alone, does not raise a genuine dispute of material fact regarding whether there is a causal connection between the protected activity and Defendant's alleged retaliation. *See, e.g., Mickey*, 516 F.3d at 525 (acknowledging that plaintiffs are not prevented "from ever using a temporal proximity closer than four months to

establish an inference of retaliation"). Yet Beauvais offers additional evidence of retaliatory conduct, namely Inkster's delay in returning her to work and her demotion from acting Sergeant. This delay and demotion, and the accompanying loss of salary and benefits, provides sufficient additional facts. *See* Dkt. No. 31-21, p. 72 (Pg. ID 849) (noting that Beauvais was paid more as acting Sergeant than as a patrol officer).

### 3. Inkster's Justifications

As Plaintiff has produced enough evidence to raise a genuine dispute regarding a *prima facie* retaliation claim, "the burden of production of evidence shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its actions." *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 996 (quoting *Canitia v. Yellow Freight Sys.*, 903 F.2d 1064, 1066 (6th Cir. 1990)). The Court finds that Inkster does not provide a legitimate, nondiscriminatory reason for delaying Plaintiff's return to work, but does for demoting Plaintiff from acting Sergeant and stripping Plaintiff of her police powers.

First, Inkster does not respond to the allegation that it improperly delayed Beauvais's return to work after she had obtained clearance from the independent doctor. *See, e.g.,* Dkt. No. 31, p. 21 (Pg. ID 239) (only addressing delay with respect to Beauvais's medical clearance from her doctors). Inkster's only discussion of this issue in the record comes from Human Resources Director Smith. Smith testified

that she does not know when Inkster received the independent doctor's clearance letter, which was dated April 21, 2015. Dkt. No. 32-12, p. 13 (Pg. ID 1342). And when asked why Beauvais was not returned to work for three weeks, Smith replied "I can't answer that." *Id.* Smith did offer reasons why the City might have delayed Beauvais's return, but cautioned that she was speculating. Dkt. No. 32-12, p. 13 (Pg. ID 1342). She explained that Inkster may have delayed Plaintiff's return to work because it was preoccupied with a lawsuit, had encountered scheduling issues, or had difficulty reaching Beauvais. *Id.* Yet because Inkster offers only speculation as to why it delayed Beauvais's return to work, Inkster has not offered a legitimate, nondiscriminatory for its delay.

Second, Defendant alleges Beauvais was demoted because Sergeant Davidson returned to work; thus, she "could resume her administrative duties and the Lieutenants could perform the tasks that Davidson still could not." Dkt. No. 31, p. 22 (Pg. ID 240). Defendant asserts that this "arrangement was worked out for financial reasons as Inkster had not budgeted for an additional Sergeant." *Id.* at p. 22–23 (Pg. ID 240–41). The Court concludes that these financial considerations are a legitimate, nondiscriminatory reason for demoting Beauvais.

As for removing Beauvais's police powers, Inkster contends that officers taking personal leave were ordinarily required to turn in their service weapons and relinquish their police powers. Dkt. No. 31, p. 20 (Pg. ID 238); *see also* Dkt. No.

31-14, p. 34–36 (Pg. ID 622–24). Indeed, Chief Yost testified that this requirement was consistent with recommendations from police associations, and in Beauvais's case, it was also prompted by a concern about Inkster's liability. Dkt. No. 31-14, p. 34–36 (Pg. ID 622–24). The Court finds that these reasons are legitimate and nondiscriminatory, and therefore, Beauvais must show that these reasons were pretext.

### 4. Pretext

Beauvais has shown a reasonable juror could conclude that Inkster's reasons for delaying her return to work, demoting her from Sergeant, and removing her police powers were pretext.

At this stage of the *McDonnell Douglas* framework, a plaintiff "must demonstrate 'that the proffered reason was not the true reason for the employment decision.'" *Hunter*, 565 F.3d at 996 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). Specifically, to survive a motion for summary judgment on the issue of pretext, a plaintiff must present sufficient evidence "to rebut, but not to disprove, the defendant's proffered rationale." *Shazor v. Prof'l Transit Mgmt., Ltd.*, 744 F.3d 948, 957 (6th Cir. 2014) (quoting *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012)). A plaintiff may present sufficient evidence of pretext by showing "(1) that the proffered reasons had no basis *in fact,* (2) that the proffered reasons did not *actually* motivate [the adverse actions], or (3) that they were

*insufficient* to motivate [the adverse actions]." *Chattman v. Toho Tenax America, Inc.*, 686 F.3d 339, 349 (6th Cir. 2012) (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).

Beauvais argues that Inkster's proffered reasons for delaying her return have no basis in fact. Dkt. No. 32, p. 14 (Pg. ID 33). The Court agrees based on the same reason that the Court found Inkster failed to offer a legitimate, nondiscriminatory reason for delaying Beauvais's return—Inkster has not offered an explanation for its delay.

On the other hand, Beauvais asserts that Inkster's justification for demoting her from Sergeant, financial considerations, did not actually motivate her demotion. Dkt. No. 32, p. 20 (Pg. ID 1221). She alleges that at the time of her demotion, Inkster was not cutting expenses in other ways. *Id.* at p. 20 n.6 (Pg. ID 1221). Beauvais cites as an example the City's payment of overtime to another Sergeant for tutoring individuals in the police academy. *Id.* at p. 20 (Pg. ID 1221); *see also* Dkt. No. 32-28, p. 5 (Pg. ID 1414). She also references testimony from another officer that the Inkster Police Department had greatly exceeded its budget regarding the payment of overtime. *See, e.g.,* Dkt. No. 32-7, p. 6 (Pg. ID 1311). Based on this evidence, the Court finds that Beauvais has rebutted Inkster's contention that financial considerations warranted her demotion. Although exceeding its overtime budget could have made the City more cautious in expending salary, Plaintiff provides

evidence that the City continued to expend resources on overtime despite its financial concerns. As a result, Beauvais has raised a genuine dispute on this issue.

Finally, Beauvais has rebutted Inkster's reasons for removing her police powers. In particular, Beauvais has presented evidence that, in practice, officers on leave were generally allowed to keep their police powers, including their service weapons. Dkt. No. 32-11, p. 6 (Pg. ID 1329). Indeed, another Inkster police officer testified that officers on leave would not have to surrender their gun "[u]nless they're separating from the Department or suspended." Dkt. No. 32-11, p. 6 (Pg. ID 1329). Neither of these circumstances, of course, applied to Beauvais.

Moreover, the timing of Inkster's removal of Beauvais's police powers rebuts Inkster's explanation. Inkster mandated that Beauvais relinquish her weapon in December 2014, four months after she took leave. If the removal of police powers was typically required for persons taking leave, Inkster should have forced Beauvais to give up her weapon much earlier. As a result, Beauvais has raised a genuine dispute of material fact regarding whether Inkster's justifications are pretext.

## V.     Conclusion

For the reasons stated herein, the Court will GRANT IN PART and DENY IN PART Defendant's Motion for Summary Judgment [31]. The Court grants the Defendant summary judgment as to Counts I, II and III. The Court denies the Defendant summary judgment as to Count IV.

Dated: November 9, 2017

s/Gershwin A. Drain
GERSHWIN A. DRAIN
United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on **November 9, 2017.**

s/Tanya R. Bankston
TANYA R.BANKSTON
Case Manager & Deputy Clerk